LeMonte v. United States.

[Cite as LeMonte v. United States, 15 Ohio Misc. 348.]

(No. C 64-467—Decided July 8, 1966.)

United States District Court, Northern District of Ohio, Eastern Division.

*Messrs. Weisman & Jeffries, Mr. Fred Weisman* and *Mr. Salvatore P. Jeffries,* for plaintiff.
*Mr. Merle M. McCurdy,* United States Attorney, and *Mr. D. J. Cimino,* for defendant.

Thomas, J. The responsibility now rests on the court to render a verdict and judgment in this action. In accordance with Rule 52-A of the Federal Rules of Civil Procedure, the findings and conclusions contained in my oral opinion shall constitute the findings and conclusions of this court.

At a pre-trial conference held the day before the case was set for trial counsel for the government admitted its responsibility for the plaintiff's blindness, and in the words

of counsel for the government, "The only issue left to be resolved is how much the government should pay."

As counsel for plaintiff then put it, the case was to proceed solely "on the issue of the blindness and all consequences flowing therefrom." With this statement government counsel agreed.

It is found and determined that from and after July 30, 1963, the plaintiff has suffered bilateral optic nerve atrophy. He is permanently and totally blind. This occurred when he had just turned 49, his birthday being July 2nd. He was born in 1914.

This blindness occurred during and in the course of a second stage bilateral radical neck dissection. The first stage of the operation, in the course of which a cancerous larynx or voice box and some other cancerous nodes were removed, took place on May 22, 1963.

It is further found and determined that for some 20 years, from 1943 to 1963, except for 29 months of military service occurring in the years 1943 through 1945, the plaintiff was employed by the H. G. Clark Provision Company, employment stopping there sometime in early 1963.

During this period he worked as a member of the killing gang on the killing floor of this provision company.

In the latter part of his employment he served as the trusted and reliable chief butcher of the killing gang. His duties were partly physical duties and partly administrative over the other members of the gang.

In 1962 his total wages from all sources were about $4,500, of which $4,200 was received in wages from the H. G. Clark Provision Company of Dennison, Ohio.

It appears and it is found that the H. G. Clark Company ceased operation in early 1963; however, before this had happened the plaintiff had gone to work as a butcher or meat cutter at the New Philadelphia Provision Company. His starting rate there was $1.50 an hour. He worked there until shortly before the first operation, I think perhaps on about May 17th of 1963, and he resumed his work there sometime in the latter part of June of 1963. He worked then an additional two to three weeks.

His last day of work was July 13, 1963, and this, of course, was just about roughly 17 days, and I think perhaps it might even be less than that, before he was operated a second time at Crile Hospital here in Cleveland.

During his employment with the New Philadelphia Provision Company his regular work week was 44 hours, of which four hours were compensated on a time and a half basis. In addition he received the right to purchase meat and other foods at wholesale prices. It was estimated, and not contradicted, that this represented a savings for him of about $5 a week.

It is found and determined that the radical neck and larynx surgery would not have disabled him from continuing and from performing the essential duties of his occupation of butcher and meat cutter. As Dr. Julian McCall, a renowned otolaryngologist of this city put it, "without blindness he would have been able to return to his ordinary duties."

It is clear from the evidence that work would have been available for him at the New Philadelphia Provision Company until April of 1966, when that company ceased business; however, it appears that convalescence from the neck surgery, wholly apart from the blindness, would have prevented him from returning to work until sometime around the first of September, 1963.

It is found and determined that he would have returned to work but for the blindness which struck him on July 30 during the course of the second neck operation.

Applying a rate of pay of $1.50 an hour through April of 1964, $2 an hour through April of 1965, and $2.20 an hour through April of 1966, and adding the increment of savings resulting from wholesale purchases, I determine and find that his actual wage loss through April of 1966 amounts to $12,400.

I turn now to consider the elements of damages relating to future income loss. At an earlier stage in this trial I stated my findings with reference to the availability of further work in his occupation in the Canton-Massillon area. I will not repeat my findings but incorporate them as part of the findings I now make by reference. It is clear

that there was work available, there was a shortage of meat cutters and butchers in the Canton-Massillon area, and that this man with his demonstrated skill, competence and training, could have taken employment from and after April of 1966 but for his blindness.

It is evident and it is established here in the evidence that the prevailing wage rate for a man entering, as he would have entered, in April of '66, and in the last few months, would have been about $2.86 an hour, or maybe a few cents more, but I take that figure. With reasonable certainty the evidence warrants the finding, and I do so find, that a need for a man of his skill, training and experience as a butcher and meat cutter existed in April of 1966 and in the general area of his residence and the adjoining counties, that he could have obtained employment by driving some 25 or 30 miles each way each day, or by moving into the Canton-Massillon area, which was perhaps in an adjoining county, and it is reasonably predictable that this would have continued during the 14 years of his remaining work expectancy.

Taking all the evidence into consideration on this phase of the case, including but not limited to the evidence which I have discussed previously, conservatively estimating his future wage loss and computing it in terms of present value, I fix the future wage loss at $85,000.

We come then to the matter of claim for nursing services. On the whole evidence it is found and determined that some nursing services will be required from now on, and in fact have been required up to now, with reference to his care, with reference to assistance needed flowing as a consequence of his total blindness.

His life expectancy is found and determined to be 21.7 years. At the present time, and largely because of her devoted attachment to her husband, his wife is performing all of these nursing services. I think the evidence requires me to find that to a degree the nursing services which she is performing results from her over-protective nature and because of her excessive, if it can be said in those words, wifely affection for her husband.

It can also be said, and it is found, and I think properly

so on this evidence, that he is now requiring and apparently will require, additional nursing services because of his failure to undertake and undergo rehabilitation. The evidence makes it clear to me that if he can break down this mental block that is preventing him from undertaking what is available and waiting, and which has been waiting for him—in fact, he was accepted at Hines Hospital in the fall of 1963—he can become more self-sufficient, and undoubtedly this has to be considered in terms of the amount of nursing services for which I now find compensation should be included. Taking all these things into consideration and all the evidence on the subject, I reach a figure and do find that as part of the award there should be included the sum of $59,000 for nursing services.

We come then to the final element, pain and suffering, or as the government has put it, "general damages."

The impact upon this plaintiff, upon his personality, upon the whole man, as a result of total blindness has been devastating.

This is a man who gained his joys, his pleasures, from working hard at his employer's business, to further his employer's well-being, and just as hard at home.

He gained pleasure from nurturing and culturing and watching plants grow in his garden. He gained joy from seeing the beautiful countryside of Eastern Ohio, around his home. He gained the thrill of being behind the wheel of an automobile on every week end, seeing nature unfold, the stars and the sun. All of these things he now loses through the total darkness that has enveloped him and for which the government accepts full responsibility.

The pain which has come to him and which will beset him every day of his remaining years on this earth is pain without physical hurt, but it is pain full of mental suffering. For him, he will always have a silent and eternal spring.

How does one fairly translate this into dollars? There is no formula available. Recourse to some per diem shorthand is not accurate or dependable in trying to achieve this task.

On the other hand, it is perfectly clear that I must consider his failure to engage in rehabilitation, which I have previously noted is available and waiting. This factor must also be weighed on the other side in terms of whatever figure I finally arrive at on pain and suffering, for the weight of the mental burden that presses upon him clearly would be lessened, the evidence compels me to find, were he to undertake and to complete and carry out the available rehabilitation.

Considering all the factors and attempting to be fair to plaintiff and to be fair to the government, and to be realistic in the light of all the evidence, I compute the dollar value of the pain and suffering at $150,000.

As you have noticed, I have refrained from considering as any separate item of damage any amount for the household services that he performed or the driving that he engaged in, though counsel for the plaintiff pressed this point with some detail; however, I have considered those things, as you have noted, in determining the over-all general damages or pain and suffering, for which an award is included.

Adding all these items together I reach and fix total damages to be awarded to James LeMonte and against the United States of America in this case in total sum of $306,400.

### CERTIFICATE

I, Jack E. Donley, Official Court Reporter in and for the United States District Court for the Northern District of Ohio, Eastern Division, do hereby certify that the above and foregoing is a true and correct transcript of the proceedings herein.

Jack E. Donley

Official Court Reporter